T.C. Memo. 2020-54

UNITED STATES TAX COURT

OAKBROOK LAND HOLDINGS, LLC, WILLIAM DUANE HORTON,
TAX MATTERS PARTNER, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 5444-13.                    Filed May 12, 2020.

David M. Wooldridge, Michelle A. Levin, Ronald A. Levitt, and Gregory P. Rhodes, for petitioner.

W. Benjamin McClendon, Bruce K. Meneely, Robert W. Dillard, and William W. Kiessling, for respondent.

[*2]        MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, Judge:  In recent years the Commissioner has attacked a popular

form of charitable contribution--the donation of conservation easements.[1]  Many

of these attacks are surgical strikes on what he believes are gross exaggerations of

the value of particular easements.  But he has also launched three sorties--all

predicated on the requirement that such easements be "perpetual"--that he hopes

will cause more widespread casualties:

- an attack on the power of donor and donee to change the terms of the easement after its contribution;

- an attack on the retained right of the donor to add improvements to the property described in the easement; and

- an attack on a clause commonly found in easements, particularly in the southeastern part of the country, that divides between donor and donee future hypothetical proceeds from a future hypothetical extinguishment of the easement in a way that he claims violates one of his regulations.

In Pine Mountain Pres., LLLP v. Commissioner, 151 T.C. 247, 280-82

(2018), we held that the retained power of all parties to all contracts to change

contractual terms does not by itself deprive a deed of easement of its required

perpetuity.  We also held there that a donor's retained right to add improvements

---

[1] See, e.g., I.R.S. News Release IR-2005-129 (Oct. 27, 2005) (referring to certain conservation easements as abusive).

**[*3]** "appurtenant to residential development" does violate the perpetuity requirement as a matter of law when the precise location of those improvements is not set forth in the deed of easement.  Id. at 275-79.

In this case, the Commissioner seeks to destroy any charitable-contribution deduction for an easement whose deed contains an extinguishment clause that he argues does not meet the requirements of one of his regulations, section 1.170A-14(g)(6)(ii), Income Tax Regs.  This case appears to be the first one in which the donor fights back by challenging the validity of that regulation.

What the regulation means and whether it's valid are questions whose answers will affect a great many such donations.  There's a difference of opinion in the Court on the question of the regulation's validity; there is not on the factfinding and application of the regulation to those facts.

FINDINGS OF FACT

In 2007 a couple was driving on a country road about fifteen minutes outside Chattanooga in search of the perfect place for a new home.  They stopped at a briar-covered for-sale sign on a 143-acre piece of land on White Oak Mountain.  The property was significantly larger and considerably more overgrown than what they wanted, but they thought it could be the diamond in the rough for which they had been prospecting.

**[*4]** To understand why requires understanding who the husband in this couple is. Duane Horton grew up in Chattanooga, earned a degree in construction from Georgia Tech, and moved back to his home town. He started his career there in 1998, and in 2002 he formed a construction company. Horton proved to be a talented entrepreneur, and his company grew and became quite successful. In 2007 Horton and a number of his subcontractors, suppliers, and past clients formed a real-estate development company and a real-estate investment fund. The development company excels in "working with larger pieces of property that are * * * usually in high-growth sectors of the area that may have challenges, * * * [such as] lack of infrastructure, access issues, rezoning issues, or topography issues, * * * and solv[ing] those problems and unlock[ing] the potential value of the property." So when Horton drove past the property in 2007, he was uniquely able to see its potential, and he quickly contacted various investors to plan how to buy and develop it.

Horton and these investors formed Oakbrook Land Holdings, LLC in August 2007 and four months later it bought the property for $1,700,000. Oakbrook planned at first to develop the subject property with "higher-end, single-family residences with a commercial service area." But before that vision could be realized, Oakbrook had to overcome a number of thorny obstacles, briars the least

[*5] among them.  It started by building a bridge across the "Hurricane Creek;" this alone created access to more than 80% of the previously inaccessible property.  It then installed a high-pressure sewer-pump station and won rezoning of a portion of the property from A-1 Agricultural District to C-2 Local Business and Commercial District.

As 2007 turned into 2008, Horton learned about a conservation easement on an entirely unrelated property in North Georgia.  He was intrigued and began to do some research.  At some point in 2008 he started to think about placing a conservation easement on the Oakbrook property.  He met with James Wright, executive director of the Southeast Regional Land Conservancy, who gave him a short course on the easement process and told him that the Conservancy's lawyers would draft the legal paperwork should Oakbrook want to give it an easement.  Horton took what he learned to the other Oakbrook investors who, despite some early opposition, agreed to the idea.  Oakbrook's next move was to transfer some of the acreage to related entities in mid-December 2008, which enabled it to be developed without restriction.  This left Oakbrook with approximately 106 acres.

Later that month Oakbrook donated a conservation easement on all 106 acres to the Conservancy through a document called "Conservation Easement and Declaration of Restrictions and Covenants" (Deed).  Because of its unfamiliarity

**[*6]** with conservation easements, Oakbrook and its members relied heavily on the Conservancy to draft this Deed. We specifically find that Horton, acting on behalf of Oakbrook, was reasonable in inferring that the Conservancy's experience meant that the deeds it had drafted conformed to the Code and regulations.

The Deed's key section for this opinion is Article VI, Section B(2). It governs how Oakbrook and the Conservancy will divide between themselves any proceeds if the easement is extinguished by changed circumstances or condemnation:

> This Conservation Easement gives rise to a real property right and interest immediately vested in [the Conservancy]. For purposes of this Conservation Easement, the fair market value of [the Conservancy]'s right and interest shall be equal to the difference between (a) the fair market value of the Conservation Area as if not burdened by this Conservation Easement and (b) the fair market value of the Conservation Area burdened by this Conservation Easement, as such values are determined as of the date of this Conservation Easement, (c) less amounts for improvements made by O[akbrook] in the Conservation Area subsequent to the date of this Conservation Easement, the amount of which will be determined by the value specified for these improvements in a condemnation award in the event all or part of the Conservation Area is taken in exercise of eminent domain as further described in this Article VI, Section B(3) below. If a change in conditions makes impossible or impractical any continued protection of the Conservation Area for conservation purposes, the restrictions contained herein may only be extinguished by judicial proceeding. Upon such proceeding, [the Conservancy], upon a subsequent sale, exchange or involuntary conversion of the Conservation Area, shall be entitled to a portion of the proceeds equal to the fair market value of the Conservation Easement as provided

[*7]    above.  [The Conservancy] shall use its share of the proceeds in a
        manner consistent with the conservation purposes set forth in the
        Recitals herein.

Article VI, Section B(3) goes on to state:

        Whenever all or part of the Conservation Area is taken in
        exercise of eminent domain * * * so as to abrogate the restrictions
        imposed by this Conservation Easement, * * * [the] proceeds shall be
        divided in accordance with the proportionate value of [the
        Conservancy]'s and O[akbrook]'s interests as specified above; all
        expenses including attorneys fees incurred by O[akbrook] and [the
        Conservancy] in this action shall be paid out of the recovered
        proceeds to the extent not paid by the condemning authority.

According to Wright, the above language is standard among the

Conservancy's conservation easements.  And although he couldn't say with

absolute certainty, Wright was "pretty sure" the language was adopted from

numerous other model agreements, including those produced by the Land Trust

Alliance.[2]

Wright explained that, as with the regulation, this extinguishment clause

starts by defining the fair market value (FMV) of the easement as the difference

between the property's value without the easement and the property's value with

---

[2] Wright suggested that the Conservancy has 85 easements with similar
language.  According to *amici* in another case, however, there is reason to believe
thousands of conservation easements have similar language.  Brief for Land Trust
Alliance, Inc. et al. as Amici Curiae Supporting Petitioners at 6, PBBM-Rose Hill,
Ltd. v. Commissioner, 900 F.3d 193 (5th Cir. 2018) (No. 17-60276).

[*8] the easement. Wright stressed that he viewed this language as securing a fixed amount for the Conservancy. He explained that the Conservancy expected that Oakbrook would exercise its right to improve the property within the limits set by the Deed, but did not think it right for the Conservancy to share in any condemnation award or extinguishment proceeds attributable to any improvements: The Conservancy, Wright credibly testified, "did not pay for those improvements" and shouldn't have a "property interest in those improvements." He also had a view on what the regulation required: "[R]ather than having a proportion * * * -- the Treasury regulation requires at a minimum that a proportion -- * * * our language establishes fair value a[s] an absolute -- it's not a proportion; therefore, it is [al]ways going to exceed * * * the minimum required by the IRS."

While Oakbrook worked toward closing on the easement, it also started to look for an appraiser to value the conservation easement for purposes of claiming a charitable deduction. Oakbrook picked Dave Roberts, who valued the easement at $9,545,000. This is the amount Oakbrook claimed on its Form 1065, U.S. Return of Partnership Income, as a charitable contribution.[3]

---

[3] Roberts initially valued the easement at approximately $19,500,000. Horton asked for a second appraisal because "a number of consultants and investors * * * didn't feel comfortable with that high of a value."

**[\*9]**   To prepare its 2008 return Oakbrook hired Henderson Hutcherson &

McCullough, PLLC (HHM), an accounting firm familiar with Oakbrook and the

requirements for conservation-easement deductions.  Horton was unfamiliar with

conservation easements and under intense scrutiny by Oakbrook's investors, so he

discussed Oakbrook's 2008 tax return with HHM multiple times.  This assured

him that the easement deduction was proper.

HHM's assurance did not extend to the Commissioner, who timely issued an

FPAA[4] to Oakbrook for its 2008 tax year.  In it, the Commissioner completely

disallowed Oakbrook's charitable contribution and asserted an accuracy-related

penalty under section 6662 for negligence, disregard of regulations, or substantial

---

[4] FPAAs are notices of final partnership administrative adjustment.  Before
its repeal, see Bipartisan Budget Act of 2015, Pub. L. No. 114-74, sec. 1101(a),
129 Stat. at 625, part of the Tax Equity and Fiscal Responsibility Act of 1982
(TEFRA), Pub. L. No. 97-248, secs. 401-407, 96 Stat. at 648-71, governed the tax
treatment and audit procedures for certain partnerships.  TEFRA partnerships are
subject to special tax and audit rules. See secs. 6221-6234. When the IRS audits a
TEFRA partnership return and determines an adjustment is necessary, it sends the
partnership an FPAA.  The FPAA describes all the proposed changes at the
partnership level.  TEFRA partnerships designate a partner to act as the tax matters
partner to deal with the IRS.  Sec. 6231(a)(7).  (Unless otherwise indicated, all
section references are to the Internal Revenue Code in effect at all relevant times.)

[*10] understatement.  Oakbrook timely petitioned this Court, and we tried the case in Birmingham, Alabama.[5]

The Code requires a conservation easement to be "perpetual".  Sec. 170(h)(2)(C), (5)(A).  The Commissioner disallowed Oakbrook's deduction in part because he concluded that the Deed's extinguishment clause would split the proceeds from the property's condemnation or the easement's termination in a way that failed to protect the contribution's conservation purpose in perpetuity.  See sec. 170(h)(1)(C), (5)(A).  He points to section 1.170A-14(g)(6)(ii), Income Tax Regs.--part of a bigger set of regulations that more comprehensively fences in the Code's perpetuity requirement.  The problem these regulations try to solve stems from the fact that perpetuity can be a very long time:  What happens if a local government condemns part of the property for a road, or a local power authority floods the property as part of a hydropower project, or anything else happens to the property that would destroy its conservation purpose?  Under common law such events can "extinguish" the easement; the Commissioner's regulation is meant to regulate the division of any compensation for this extinguishment

---

[5] Oakbrook's principal place of business was in Chattanooga, Tennessee, at the time the petition was filed.  This case is therefore appealable to the Sixth Circuit.  See sec. 7482(b)(1)(E).

**[\*11]** between the donor and donee so that the donee can continue to pursue the easement's conservation purpose elsewhere and into the future.

The Commissioner attacks the Deed's extinguishment clause with two related arguments. The first is that the clause's formula to distribute extinguishment proceeds doesn't correctly track the regulation, because it would distribute to the Conservancy a fixed amount, and not a proportion, of any such proceeds. The second is that the clause would subtract from those proceeds the value of improvements that Oakbrook could make after the donation. Oakbrook responds that the extinguishment clause complies with the regulation but, if it does not, the regulation is invalid.[6]

OPINION

I.  Qualified Conservation Contributions

Conservation easements are supposed to preserve properties with natural, historical, or cultural significance through perpetual restrictions on their use. They also allow donors to take charitable deductions, some of which can be quite sizable.

---

[6] In his brief the Commissioner also claimed that Oakbrook is liable for a gross-valuation misstatement penalty under section 6662(h), a substantial-valuation misstatement penalty under section 6662(e), or in the alternative, a substantial-understatement-of-tax penalty under section 6662(d). He has since conceded that these penalties do not apply.

[*12] The popularity of conservation easements has risen dramatically in recent years. The National Conservation Easement Database (NCED) has cataloged 167,721 conservation easements in effect throughout the United States, which affect more than 27,700,000 acres of land. Nat'l Conservation Easement Database, https://www.conservationeasement.us (last visited February 5, 2020).[7] The number of acres conserved under easement is up from the nearly 16,800,000 in 2015, 13,200,000 in 2010, and 6,100,000 in 2005. Land Trust Alliance, 2015 National Land Trust Census Report, http://s3.amazonaws.com/landtrustalliance.org/2015NationalLandTrustCensusRep ort.pdf.

As the popularity of conservation easements has increased, so too have the Commissioner's suspicions about them. See, e.g., PBBM-Rose Hill, Ltd. v. Commissioner, 900 F.3d 193 (5th Cir. 2018); BC Ranch II, L.P. v. Commissioner, 867 F.3d 547 (5th Cir. 2017), vacating and remanding T.C. Memo. 2015-130; Belk v. Commissioner, 774 F.3d 221 (4th Cir. 2014), aff'g 140 T.C. 1 (2013);

---

[7] Even the NCED, which provides the most complete up-to-date census data, admits that its numbers are significantly understated. The NCED estimates that it lists only 49% of publicly held easements and 90% of non-profit-held easements across the United States. Completeness, Nat'l Conservation Easement Database, https://www.conservationeasement.us/completeness (last visited May 11, 2020).

**[\*13]** <u>Glass v. Commissioner</u>, 471 F.3d 698 (6th Cir. 2006), <u>aff'g</u> 124 T.C. 258 (2005); <u>Pine Mountain</u>, 151 T.C. 247.  In December 2016 the Commissioner released a notice in which he characterized syndicated conservation-easement transactions[8] as potential "tax avoidance transactions," and then proceeded to include syndicated conservation easements as his newest addition to the list of 35 other "Recognized Abusive and Listed Transactions."  <u>See</u> I.R.S. Notice 2017-10, 2017-4 I.R.B. 544; <u>Recognized Abusive and Listed Transactions</u>, Internal Revenue Serv., https://www.irs.gov/businesses/corporations/listed-transactions (last updated Jan. 31, 2020).

The Code, however, makes at least some conservation easements legitimate, even though section 170(f)(3)(A) generally disallows a charitable-contribution deduction for any gift of real property that "consists of less than the * * * entire interest in such property."  The key is for a donor to meet the unusually complicated rules for a donation of a "qualified conservation contribution."  Sec. 170(f)(3)(B)(iii).  A "qualified conservation contribution" is "a contribution--(A)

---

[8] Syndicated conservation easements are transactions in which "a promoter offers prospective investors in a partnership or other pass-through entity ('pass-through entity') the possibility of a charitable contribution deduction for donation of a conservation easement."  I.R.S. Notice 2017-10, 2017-4 I.R.B. 544, 545.  The easement at issue in this case is not a syndicated conservation easement.

**[\*14]** of a qualified real property interest, (B) to a qualified organization, (C) exclusively for conservation purposes." Sec. 170(h)(1). Although a contribution must satisfy each of these requirements, our focus in this opinion is on the third requirement--that the contribution be "exclusively for conservation purposes," sec. 170(h)(1)(C), which the Code defines in the negative: "A contribution shall not be treated as exclusively for conservation purposes unless the conservation purpose is *protected in perpetuity*," sec. 170(h)(5)(A) (emphasis added).

We begin with a bit of a refresher on the common law of servitudes. A servitude is "a legal device that creates a right or an obligation that runs with land or an interest in land." 1 Restatement, Property 3d (Servitudes), sec. 1.1(1) (2000). It can be granted either appurtenant--meaning "the rights or obligations of a servitude are tied to ownership or occupancy of a particular unit or parcel of land," id. sec. 1.5(1), or in gross--meaning "the benefit or burden of a servitude is not tied to ownership or occupancy of a particular unit or parcel of land," id. sec. 1.5(2). Easements, a form of servitude, may also be appurtenant or in gross, but because "most conservation and preservation servitudes are granted to governmental bodies, land trusts, or other charitable entities * * * , the benefit will usually be in gross." Id. sec. 1.6 cmt. a.

**[*15]** States were wary of simply applying traditional servitude law to conservation easements. Servitudes, like other contracts, are usually between private parties, and situations may arise where the parties no longer want to enforce the restriction or the restriction's continued enforcement becomes unjust. Imagine, for example, a homeowners association (HOA) whose members agree to build ranch-style homes to preserve their views of a nearby mountain, only to have an office building that blocks those views appear on a lot between the HOA homes and the mountain. A disgruntled homeowner might sue his HOA and urge that this change in condition should terminate the restriction. See 2 Restatement, supra, sec. 7.10. Termination of a servitude for changed conditions benefits all the property owners that used to be bound by it, so the common law seldom requires any money damages when one is extinguished. Id. sec. 7.11 cmt. c.

That general rule of implicit compensation for the loss of a servitude wouldn't work with conservation easements. And neither would the general power of parties to servitudes, like parties to every other contract, to change their terms. See id. sec. 7.1. Conservation easements are usually clothed with assertions of a significant public interest, not only because their enforcement preserves valuable land for public benefit, but also because "their creation is subsidized indirectly by tax deductions and directly through purchases by public

[*16] agencies and nonprofit corporations." Id. sec. 7.11 cmt. a. Permitting an unrestricted right to modify a conservation easement, or terminate one altogether, could result in a loss of the public's investment.

Applying the common-law rule--extinguishment without cash compensation--could also lead to unusual results. A landowner with a black heart could place a conservation easement on his property, take the associated deduction, and then pave paradise and put up a parking lot on adjoining property. He might prove that the easement's conservation purpose was destroyed and should no longer restrict development of the subject property, and then sell the now-unburdened land. See id. cmt. d. The common-law rule of only implicit compensation for termination of an easement could embolden landowners (imagine well-financed developers) to use the threat of protracted changed-conditions litigation to coerce donees (imagine thinly staffed nonprofit organizations) into modifying or terminating their easements. Id. The cynic, or even just the realist, can also foresee some probability of collusion between donors and donees of conservation easements if conservation easements could create benefits with both their formation and their destruction.

As conservation easements became popular, states enacted statutes to change this feature of common law. Tennessee is among them. See Tenn. Code

[*17] Ann. sec. 66-9-306 (West 2020) (conservation easement valid even if no privity of estate or contract or no benefit to any other land, and "[n]o conservation easement shall be held automatically extinguished because of violation of its terms or frustration of its purposes"). These state-law changes help make conservation easements perpetual, but the mix of statute, regulation, and caselaw that defines what "perpetual" means can be confusing and might undermine a great many conservation deeds of easement for reasons their drafters never expected.

One part of the solution is to limit the ability of donors and donees to declare "changed circumstances" all by themselves. Conservation easements typically have clauses, like the one here between Oakbrook and the Conservancy, that provide "[i]f a change in conditions makes impossible or impractical any continued protection of the Conservation Area for conservation purposes, the restrictions contained herein may only be extinguished by judicial proceeding." Deed, Article VI, Section B(2). Getting a judge involved means there will be a third party to monitor whether conditions really have changed.

But there's a special problem with what happens to an easement that simply cannot be preserved forever. If a conserved building is obliterated in a disaster, or a conserved open space is condemned for public use, then insurance money or a condemnation award may be substituted for the property. The original easement is

[*18] no more, but how can money preserve the easement's conservation purpose "in perpetuity?" In this situation the law causes the conservation purpose to jump into the money into which the easement has been converted. If part of that money goes to the easement holder, the conservation purpose is considered to have survived. That's in the Deed here, too, in the section that says the Conservancy "shall be entitled to a portion of the proceeds equal to the fair market value of the Conservation Easement as provided above." Id.

Then there's the particular problem that arises when the donor reserves the right to build various structures on the conservation area. For example, if the donor reserves and subsequently exercises his right to build a home on the land, and the entire property is later condemned, the condemnation award will necessarily include that added value. But is it the donor or the donee who is entitled to the proceeds attributable to the value of the home?

The Code doesn't answer these questions--it just says that the conservation purpose of a conservation easement must be preserved "in perpetuity." Sec. 170(h)(5)(A). But the Treasury Department issued a regulation that more precisely defines the term. There we find that a conservation purpose is not perpetual if the donee organization that holds the easement is unable to carry on the conservation purpose following judicial extinguishment. See sec.

**[*19]** 1.170A-14(g)(6)(i), Income Tax Regs.  To avoid this, the regulation

provides that if

> a subsequent unexpected change in the conditions surrounding the
> property * * * make[s] impossible or impractical the continued use of
> the property for conservation purposes, the conservation purpose can
> nonetheless be treated as protected in perpetuity if the restrictions are
> extinguished by judicial proceeding and all of the donee's *proceeds*
> (determined under paragraph (g)(6)(ii) of this section) from a
> subsequent sale or exchange of the property are used by the donee
> organization in a manner consistent with the conservation purposes of
> the original contribution.

Id. (emphasis added).

But just how much of the "proceeds" must the donee receive upon

extinguishment, either by judicial decree of changed circumstances or by

condemnation?  For that answer, we look to paragraph (g)(6)(ii), which reads:

> at the time of the gift the donor must agree that the donation of the
> perpetual conservation restriction gives rise to a *property right,*
> immediately vested in the donee organization, with a *fair market
> value that is at least equal to the proportionate value* that the
> perpetual conservation restriction at the time of the gift, bears to the
> value of the property as a whole at that time.  See
> § 1.170A–14(h)(3)(iii) relating to the allocation of basis. * * * [T]hat
> *proportionate value* of the donee's property rights *shall remain
> constant*.  Accordingly, when a change in conditions gives rise to the
> extinguishment of a perpetual conservation restriction * * * the donee
> organization, on a subsequent sale, exchange, or involuntary
> conversion of the subject property, *must be entitled to a portion of the
> proceeds at least equal to that proportionate value of the perpetual
> conservation restriction*, unless state law provides that the donor is

**[\*20]** entitled to the full proceeds from the conversion without regard to the terms of the prior perpetual conservation restriction.

Id. subdiv. (ii) (emphases added).

It is the meaning and application of this regulation that the parties dispute.

## II.    Application of the Regulation

Both the regulation and the relevant section of the Deed are densely written, and the parties disagree about what they mean.  We therefore need to

- interpret the regulation,

- construe the Deed's extinguishment clause, and

- analyze whether the extinguishment clause meets the requirements of the regulation.

### A.    Interpreting the Regulation

Our first chore is to analyze what this regulation means.  We have already done this in Coal Property Holdings, LLC v. Commissioner, 153 T.C. 126 (2019). We held there that the regulation requires the grantee's proportionate share upon extinguishment of a conservation easement to be a percentage determined by a fraction, the numerator of which is "the fair market value of the conservation easement on the date of the gift," and the denominator of which is "the fair market value of the property as a whole on the date of the gift."  Id. at 137 (quoting Carroll v. Commissioner, 146 T.C. 196, 216 (2016)).

**[\*21]** We issued <u>Coal Properties</u> while deliberating on this case, and Oakbrook makes arguments here that Coal Properties didn't, so we'll briefly review them. Oakbrook points out that the regulation doesn't say proportionate share but proportionate "value"--which it contends means a "fixed value," i.e., a *whole number*, and not a fraction at all. And a whole number that as of the donation date is equal to the difference between the FMV of the property before and after the easement goes into effect. This reading, Oakbrook contends, means that upon extinguishment the Conservancy must be entitled to at least that fixed value. And because the regulation requires that the value be fixed *as of the donation date*, the donee is not entitled to any proceeds attributable to the value of postdonation improvements. The Commissioner tells us that it is the donee's *property right* that must at least equal the "proportionate value" of the restriction to the FMV of the property as a whole. That would be similar to a fractional interest in the property and would mean that the donee would be entitled to any extinguishment proceeds multiplied by that fraction.

Oakbrook tells us that the donee's property right must have a *fair market value* that must at least equal the "proportionate value" of the restriction to the FMV of the property as a whole. If Oakbrook is right, then the only reason to figure out the proportion of the FMV of the easement to the value of the property

**[*22]** as a whole is to make a one-time calculation as of the date of the easement to fix the amount that the Conservancy would be entitled to upon any future condemnation or extinguishment.

We noted in Coal Properties that there has also been one circuit court that's looked at the problem. See PBBM-Rose Hill, 900 F.3d at 205-07. That court found the regulation ambiguous, and observed that if "proportionate value" modifies "property right," it equals a fraction, but if it modifies "fair market value," it equals "the dollar amount of the value of the conservation easement at the time of the gift." Id. at 206.

Notice that both these conflicting readings require tinkering with the actual language of the regulation. The Commissioner would be happier with a regulation that said "proportionate share" instead of "proportionate value," and Oakbrook would be happier with a regulation that deleted the word "proportionate" from the phrase "proportionate value." It argues that we should hold that an easement's conservation purpose would be protected in perpetuity so long as the FMV of a donee's property interest equals the value of the perpetual conservation restriction at the time of the gift. But "proportionate" isn't the only part of the regulation that Oakbrook's reading would have us cut out--it would also force us to excise the rest of the key sentence--"bears to the value of the property as a whole at that

[*23] time." Sec. 1.170A-14(g)(6)(ii), Income Tax Regs. This reading would have us allocate proceeds through the use of subtraction, not multiplication. Treasury's regulation writers, however, know how to command subtraction. See, e.g., sec. 1.422-1(a)(2)(ii), Income Tax Regs. ("[C]apital gain or loss must be recognized * * * to the extent of the *difference* between the amount realized from such transfer and the adjusted basis of such share" (emphasis added)). And reading "proportionate" out of "proportionate value"--much less effectively excising an entire chunk of a sentence of the regulation--runs afoul of the traditional rule that courts should attempt to give meaning to every word of a regulation. See Rosenberg v. XM Ventures, 274 F.3d 137, 141-42 (3d Cir. 2001).

The Commissioner's edit--rewrite "proportionate value" to mean "proportionate share"--is much lighter than Oakbrook's. But it is still a gloss and not a plain reading. The Fifth Circuit took a lengthy look at these conflicting interpretations, and concluded that the regulation was ambiguous. PBBM-Rose Hill, 900 F.3d at 205-07. Ambiguity then meant that the court felt free to range outside the regulation to construe it. Id. at 206. It was particularly careful to observe that when a regulation is ambiguous, courts should defer to the agency that issued it. Id. at 206-07 (deferring to the Commissioner's interpretation

**[\*24]** "[b]ecause the extinguishment regulation is ambiguous" and citing Tex. Clinical Labs, Inc. v. Sebelius, 612 F.3d 771, 777 (5th Cir. 2010)).

It relied, in other words, on Auer deference. See Auer v. Robbins, 519 U.S. 452, 461 (1997). Where a regulation is ambiguous, Auer tells us to give the agency's "interpretation 'controlling' weight unless it is 'plainly erroneous or inconsistent with the regulation.'" Ohio Dep't of Medicaid v. Price, 864 F.3d 469, 477 (6th Cir. 2017) (quoting Auer, 519 U.S. at 461). We didn't have occasion to mention the possible problems of the Fifth Circuit's reliance on Auer deference when we looked at the problem in Coal Properties. But, like the Fifth Circuit, we found some comfort in the consistency of the Commissioner's interpretation over many years, as one can see in numerous private letter rulings (PLRs) issued as far back as 1999. See Priv. Ltr. Ruls. 200836014 (Sept. 5, 2008), 200403044 (Jan. 16, 2004), 200208019 (Feb. 22, 2002), 199933029 (Aug. 20, 1999).[9]

The Supreme Court recently reaffirmed Auer. Kisor v. Wilkie, 588 U.S. ___, 139 S. Ct. 2400 (2019). But in doing so it restated the principles of that deference:

---

[9] Of course PLRs aren't binding on parties, save for the party to whom one is issued, see sec. 6110(k)(3), but "they may be cited as evidence of administrative interpretation," Comerica Bank, N.A. v. United States, 93 F.3d 225, 230 (6th Cir. 1996) (citing Phi Delta Theta Fraternity v. Commissioner, 887 F.2d 1302 (6th Cir. 1989), aff'g 90 T.C. 1033 (1988)).

[*25] • <u>Auer</u> deference doesn't apply unless a regulation is genuinely ambiguous after exhausting "all the 'traditional tools' of construction." <u>Kisor</u>, 588 U.S. at ___, 139 S. Ct. at 2415 (quoting <u>Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837, 843 n.9 (1984));

• the agency's reading of an ambiguous regulation must still itself be reasonable, <u>id.</u>;

• the reading of an ambiguous regulation must also "be one actually made by the agency," its authoritative or official position and not one that is *ad hoc*, <u>id.</u> at ___, 139 S. Ct. at 2416;

• the agency's reading must in some way "implicate its substantive expertise," <u>id.</u> at ___, 139 S. Ct. at 2417; and

• the reading "must reflect 'fair and considered judgment'", <u>id.</u> (quoting <u>Christopher v. SmithKline Beecham Corp.</u>, 567 U.S. 142, 155 (2012)).

In construing this regulation, we see no need to rely on <u>Auer</u> deference because the "traditional tools of construction" lead us to hold that the Commissioner's construction of the regulation is correct even if we look at the question *de novo*. We can add to our plain-language analysis in <u>Coal Properties</u> a couple additional points. Notice the command in the middle of the regulation to "[s]ee [sec.] 1.170A-14(h)(3)(iii)[, Income Tax Regs.,] relating to the allocation of basis." Sec. 1.170A-14(g)(6)(ii), Income Tax Regs. That regulation tells us that "[t]he amount of the basis that is allocable to the qualified real property interest shall bear the same *ratio* to the total basis of the property as the [FMV] of the

[*26] qualified real property interest *bears to* the [FMV] of the property before the granting of the qualified real property interest." Id. para. (h)(3)(iii) (emphasis added). This language is clear. It establishes a "ratio", which is "the quotient of one quantity divided by another of the same kind, usually expressed as a fraction." Webster's New World College Dictionary 1206 (5th ed. 2016). And it tells us that the fraction's numerator is the FMV of the easement, and its denominator is the FMV of the property unburdened by the easement--effectively the same fraction that the Commissioner contends is meant by "proportionate value." What's more, to set up the numerator and the denominator for this fraction, it uses the words "bears to," which are the same words used in section 1.170A-14(g)(6)(ii), Income Tax Regs., when defining "proportionate value." This buttresses our holding that "proportionate value" means a fraction and not a whole number.

We also observe that this is what "proportionate value" seems to mean elsewhere in the U.S. Code and in other regulations. For example, the U.S. Code section that apportions federal funds among the states for animal health and disease research programs, provides:

> 48 percent [of federal funds] shall be distributed among the several
> States in the *proportion* that the value of and income to producers
> * * * in each State *bears to* the total value of and income to producers
> * * * in all the States. The Secretary shall determine the total value of

**[*27]** and income * * * in all the States and the *proportionate value* of and income * * * for each State * * * .

7 U.S.C. sec. 3195(c)(4)(B) (emphasis added).  This directs the Secretary of Agriculture to establish a "proportion" for each state equal to the value produced by each state divided by, or which "bears to," the value produced in all states.  See id.  The next sentence then refers to this "proportion" as "the proportionate value * * * for each State."  Id.  That's a fraction.

The phrase "proportionate value" also pops up in two other Treasury regulations.  Section 20.2107-1, Estate Tax Regs., provides that if a nonresident expatriate decedent owns or is considered to own a certain amount of the voting shares in a foreign corporation at the time of his death, his gross estate must include an *amount* based upon the FMV of his percentage ownership interest in the foreign corporation and the portion of the foreign corporation's total assets situated in the U.S.  See id. para. (b)(1).  It then refers to the includible amount as the "proportionate value" and directs us to "example (2) in subparagraph (2)."  Id. subdiv. (iii)(c).  That example tells us that the "proportionate value" includible in the gross estate is an amount which results from multiplying fractions and FMVs.  See id. subpara. (2), Example (2).

**[*28]** The only other Treasury regulation that uses "proportionate value" is section 25.2515-1(d)(2)(ii), Gift Tax Regs., which deals with the effect of an exchange of real property held by tenants in common. It provides that such an exchange will not terminate a tenancy so long as the tenant-spouses hold title in the exchanged property "in an identical tenancy." Id. The next sentence states that "a tenancy is considered identical if the *proportionate values* of the spouses' respective rights (other than any change in the *proportionate values* resulting solely from the passing of time) are identical to those held in the property which was sold." Id. (emphasis added). The regulation doesn't provide any examples, but the reference to "proportionate value" seems to mean a fraction of an amount equal to each spouse's property right multiplied by the FMV of the property held by the tenancy. We do not think it could reasonably refer to an amount equal to the *difference* between the values of the spouses' respective rights.

All this also supports our precedent that "proportionate value" means a fraction, and not a value. This makes us sufficiently confident of our reading to hold that even without Auer deference, the Commissioner has the better argument on the meaning of "proportionate value" in the regulation.

[*29] B.     Construing the Deed

Before we can apply the regulation to the Deed, we also need to construe the Deed. This is no easy task, because the drafters of the Deed's contested section were trying to solve a cluster of related, but distinct, problems. So we need to dissect the chunk of language reprinted supra pp. 6-7 to see how it addresses each of these problems.

The first, as we've seen, is to limit the ability of the Conservancy and Oakbrook to undo the easement by deciding between themselves that changed circumstances sufficient to undermine the easement's conservation purpose exist. They had to do this under Tennessee law as well as the Code, and did so in the middle of the paragraph: "If a change in conditions makes impossible or impractical any continued protection of the Conservation Area for conservation purposes, the restrictions contained herein may only be extinguished by judicial proceeding." Deed, Article VI, Section B(2). The Commissioner doesn't dispute that this language succeeds in its job of meeting the requirement in section 1.170A-14(g)(6)(i), Income Tax Regs., that the restrictions be ended only in judicial proceedings if they are to meet the Code's requirement of perpetuity.

The second problem is what to do with proceeds from extinguishment. The Deed language gets tangled with itself because it tries to address not just the

[*30] allocation of such proceeds, but the foreseeable contingency that Oakbrook

will exercise its retained right to add improvements to the conserved area.  Thus

we see this sentence:

> For purposes of this Conservation Easement, the fair market value of
> [the Conservancy]'s right and interest shall be equal to the difference
> between (a) the fair market value of the Conservation Area as if not
> burdened by this Conservation Easement and (b) the fair market value
> of the Conservation Area burdened by this Conservation Easement, as
> such values are determined as of the date of this Conservation
> Easement, (c) less amounts for improvements made by O[akbrook] in
> the Conservation Area subsequent to the date of this Conservation
> Easement, the amount of which will be determined by the value
> specified for these improvements in a condemnation award in the
> event all or part of the Conservation Area is taken in exercise of
> eminent domain.

Deed, Article VI, Section B(2).

The Commissioner interprets this sentence to mean that the value of the

Conservancy's property interest equals the value of the easement as of the date of

donation less the value of any subsequent improvements.  He argues this clause

actually reduces the Conservancy's interest in extinguishment proceeds by the

value of such improvements, and the value may fluctuate over time.  In the event

those improvements are "quite extensive," he argues, a situation could arise in

which the Conservancy would receive nothing upon extinguishment.

[*31] Oakbrook responds that the Commissioner isn't reading the sentence correctly. It directs our attention to the last few lines of the sentence: "(c) less amounts for improvements made by O[akbrook] in the Conservation Area subsequent to the date of this Conservation Easement, *the amount of which will be determined by the value specified for these improvements in a condemnation award in the event all or part of the Conservation Area is taken in exercise of eminent domain* as further described in this Article VI, Section B(3) below." (Emphasis added.)

Oakbrook argues that the Commissioner's concern about subtracting the value of any future improvement from what the Conservancy would otherwise get is overblown. Any such subtraction would occur only if it is "determined by the value specified * * * in a condemnation award." In the case of a partial condemnation of only a little bit of the conservation area not occupied by any improvement, there would be no subtraction and the Conservancy would get the entire condemnation award up to the FMV of the easement as of the date of donation--a better deal, it points out, than the merely fractional part of that hypothetical award that the Commissioner says is required.

And this leads to the third problem that this language addresses--what to do when there is a judicial extinguishment of the easement followed by a later

[*32] (possibly much later) sale of the property. Oakbrook says that the Conservancy would do just fine. The proceeds from such a sale would go to the Conservancy in an amount equal to the FMV of its easement because "upon such proceeding [, i.e., a judicial extinguishment proceeding], [the Conservancy], upon a subsequent sale, exchange or involuntary conversion of the Conservation Area, shall be entitled to a portion of the proceeds equal to the fair market value of the Conservation Easement as provided above." Because in this contingency there would be no specification "for these improvements in a condemnation award," the Conservancy would get its money off the top and not have to worry about the value of any improvements.

Oakbrook also argues more generally that the Commissioner's readings of the regulation and Deed would harm the Conservancy if the value of the conserved land decreases, or if it is partially condemned. Let's begin with an example where the value of land decreases following donation of the conservation easement. Imagine that the donated land at the time of the easement has an unencumbered FMV of $100,000 and an encumbered FMV of $50,000. Oakbrook adds improvements of $100,000. Property values then collapse and the easement is judicially extinguished (or condemned without specification of the value of the improvements) with proceeds recovered of $60,000. Under the Commissioner's

[*33] interpretation of the Deed, the Conservancy would receive nothing because the $100,000 in improvements is greater than the proceeds. And even if the land went unimproved, the Conservancy would get only 50% of the recovered proceeds, or $30,000. If Oakbrook is right, however, the Conservancy would in both situations get its fixed value determined at the date of donation, or $50,000.

And if the land was improved and then partially condemned? Assume again that the easement was worth $50,000 at the date of donation and Oakbrook added $100,000 in improvements. Some time later the local highway authority condemns a sliver of the land that did not include the improvements to widen an adjoining road. The condemnation award would be small--let's say $5,000. Again, under the Commissioner's interpretation of the Deed, the Conservancy would get nothing because the condemnation award was less than the value of the improvements; and under his interpretation of the regulation, Oakbrook should receive just $2,500, which is the Conservancy's proportionate share of the unimproved property's value. But under Oakbrook's interpretation, because there would be no condemnation of any improvements, and because $5,000 is less than $50,000, the Conservancy would get the entire condemnation award whether or not there had been improvements.

**[\*34]** State law defines property interests. <u>Case v. United States</u>, 633 F.2d 1240, 1246 (6th Cir. 1980); <u>Howard v. United States</u>, 566 S.W.2d 521, 525 (Tenn. 1978). And Tennessee law, following the usual common-law rule, allows for the admission of parol evidence to inform the meaning of a contract's ambiguous language if not introduced to contradict it. <u>Burlison v. United States</u>, 533 F.3d 419, 429 (6th Cir. 2008). So we asked the Conservancy's representative, Wright, how the Deed's proceeds clause would operate when the easement was extinguished after improvements were made. We found his answer entirely credible:

> [A]s long as there's a condemnation award and *if the award were to specifically identify those improvements* being the value of them, those would be deducted from the proceeds, because they aren't relevant to the valuation of the easement. [Emphasis added.]

And again:

> [A]s long as the condemnation award specifically identifies those as subsequent additions, because if they were not, then the land trust would [in]ure [to] a benefit for which it is not entitled. They did not pay for those improvements. They have no property interest in those improvements. Therefore, if we were to keep the award that took those improvements into consideration, the land trust would be getting unjust compensation because we didn't pay for those. We have to strip those away, get back to the matter at hand, and that is the value of the donation at the time of the donation.

And finally, in the case of a partial condemnation:

[*35] [A certain conservation easement is] a small part of a big property but nevertheless a utility came in and obtained a judgment to put a pipeline in the [easement] property. Of course, the owner didn't want it. He supported it but it's a utility, and we're going to lose and so, therefore, we've already gotten the judgment and was in the process of settling it. The award coming out of that -- no questions asked, there's no argument over it, the land trust is a hundred percent of the condemnation reports.

We also asked Wright about scenarios where this construction would not favor the Conservancy. Consider an increase in land values. If there were '70s-era inflation, the easement was extinguished, and the property then sold for $200,000, what would the Conservancy get? When we asked Wright at trial about this very scenario, he confirmed that the Conservancy would be entitled only to its initial fixed value.

We conclude from this that Oakbrook's reading of this section of the Deed is correct. The value of any improvements would be subtracted from any condemnation award only if it was specified in that award. The Conservancy would get the FMV of the easement as of the date of donation, and it would get the entire amount of any award for a partial condemnation not affecting any improvements or a future sale after judicial extinguishment, up to that FMV. It would not, however, be protected from inflation either in local land prices or the

**[\*36]** economy more generally; and it would not get the entire FMV if prices collapsed before a later condemnation or extinguishment.

### C. Applying the Regulation to the Deed

The Commissioner argues that Oakbrook's Deed, even if we interpret it the way Oakbrook wants us to, violates the regulation twice. First, he reiterates that it fails to define a fraction to be multiplied by the amount of any future proceeds. The Commissioner has to win on this argument--once we interpret the regulation to require a fraction multiplied by future proceeds, Oakbrook can't argue that the Deed conforms to the regulation. But the Commissioner argues that the Deed also fails because the regulation prohibits any scenario in which a donor gets to recover, either through condemnation or sale after extinguishment, any compensation for its improvements in excess of a share of the proceeds defined by the before-and-after-easement value of the unimproved land at the time of donation. We are left with the distinct sense that there are some plausible scenarios where Oakbrook's construction of "proportionate value" would protect an easement's conservation purposes in perpetuity better than the Commissioner's would. The Commissioner's construction might not compensate a donee as well as Oakbrook's, should property values decrease or if the property were only partially condemned. But our task here is to see how the Deed squares with the

**[\*37]** regulation, not whether there are plausible scenarios where the Deed would compensate the Conservancy better than the regulation.

This is where Oakbrook's argument fails. The regulation prohibits any scenario in which Oakbrook gets to recover compensation other than a proportionate share of the proceeds, with the proportion defined by the easement's FMV over the FMV of the unencumbered and unimproved property.

It also doesn't matter that the value fixed by the Deed "will *almost* universally be more than the percentage of proceeds the IRS claims the land trust is entitled to under the language" of section 1.170A-14(g)(6)(ii), Income Tax Regs., as Oakbrook argues. In other words, Oakbrook argues the Deed "substantial[ly] compli[es]" with the regulation. On this point, we need only cite Kaufman I, where we held that a donor must show strict, and not substantial, compliance with the perpetuity requirements of the regulation. See Kaufman I, 134 T.C. at 186 (petitioners "cannot avoid the strict requirement in section 1.170A-14(g)(6)(ii), Income Tax Regs., simply by showing that they would most likely be able to satisfy" their obligation to the land trust).

We agree again with the Fifth Circuit in PBBM-Rose Hill, 900 F.3d at 207. It held that "[t]he ordinary meaning of 'proceeds' is 'the *total* amount brought in,' such as 'the proceeds of sale.'" Id. (alterations in original) (citations omitted). It

**[*38]** also noted that the fact that the regulation explicitly contemplates that a donor may reserve the right to make improvements, see sec. 1.170A-14(g)(5)(i), Income Tax Regs., "but chose not to carve out an exception for the allocation of proceeds in the event of extinguishment when such improvements have been made," suggests no such carve-out was intended, PBBM-Rose Hill, 900 F.3d at 208. Substantial compliance does not work here.

Oakbrook also argues that it's unfair for a donee to receive extinguishment proceeds attributable to the value of improvements made solely by the donor--it would amount, says Oakbrook, to an unintended charitable donation for which it receives no deduction. While we might otherwise be sympathetic to this argument, we have identified as a purported purpose of the regulation the avoidance of windfalls to donors, not donees, if an easement is extinguished. See Kaufman III, 687 F.3d at 26.

It's also easy enough to imagine scenarios where a fixed value might be unfair to donees. The other purpose of section 1.170A-14(g)(6)(ii), Income Tax Regs., that we've identified is "to assure that the donee organization can use its proportionate share of the proceeds to advance the cause of historic preservation [or other conservation cause] elsewhere." Kaufman III, 687 F.3d at 26. If this is true, it would seem that providing a donee with a share of proceeds attributable to

**[*39]** inflation or rising property values better achieves this purpose. If, for example, an easement is extinguished years after its donation, during which time land values have skyrocketed, a donee organization's entitlement to a portion of the resulting increased proceeds may likely be the only way that it could afford to further its conservation purpose elsewhere.

We do note that the Commissioner's interpretation of improvements in this case contradicts his position in Priv. Ltr. Rul. 200836014 (Sept. 5, 2008), which Oakbrook claims has since been adopted by numerous land trusts, and which it argues would undermine the vast majority of easements. The relevant sentence states, "the portion of the proceeds of any subsequent sale or exchange (or condemnation) of the Protected Property payable to the Donee represents a *percentage interest* in the [FMV] of the Protected Property (*less an amount attributable to the value of a permissible improvement made by Grantors, if any, after the date of the contribution of the Easement*). Id. (emphasis added). We don't need to parse a nonprecedential PLR too closely. But this sentence is noteworthy for its seeming to construe "proportionate value" to mean "percentage interest." This is entirely consistent with the Commissioner's position in this case and tends to show continuity in the Treasury's construction of its own regulation.

**[*40]** Oakbrook is correct, however, that the parenthetical clause in the PLR that calls for the amount attributable to the value of improvements made after the easement to be taken off the top contradicts the Commissioner's current position. The Fifth Circuit addressed this exact issue by finding the regulation's meaning unambiguous as to improvements--they cannot be subtracted. PBBM-Rose Hill, 900 F.3d at 208. It also noted that "even if the regulation were ambiguous, [the Court] would not follow the [Commissioner]'s interpretation in the ruling because it contravene[d] a plain reading of the regulation without an explanation." Id. at 208-09 (citing Tex. Clinical Labs, Inc., 612 F.3d at 777); see also Salamalekis v. Comm'r of Soc. Sec., 221 F.3d 828, 832 (6th Cir. 2000) (stating that a court may defer to an agency's position when that position "presents a reasonable construction of an ambiguous provision of * * * the agency's regulations"). And PLRs simply aren't precedential--we therefore agree with the Fifth Circuit that the language of the regulation is unambiguous on this issue.[10]

Oakbrook's Deed violates the regulation because the Conservancy must be entitled to any proceeds from extinguishment or condemnation that are at least

---

[10] We are also wary of accepting the contention that numerous land trusts adopted their current deed language that subtracts the value of improvements from the proportionate value calculation, based upon a sentence of a PLR released in 2008--it seems to us that such language existed in deeds well before 2008.

**[*41]** equal to the total proceeds (unadjusted by the value of any of Oakbrook's improvements), multiplied by a fraction defined by the ratio of the FMV of the easement to the FMV of the unencumbered property determined as of the date of the Deed.

Our holding as to the meaning of section 1.170A-14(g)(6)(ii), Income Tax Regs., doesn't necessarily doom Oakbrook's deduction. Oakbrook argues in the alternative that this regulation is invalid.[11] About this there is disagreement within the Court, and we air that disagreement in a separate opinion that we also release today. See Oakbrook Land Holdings, LLC v. Commissioner, 154 T.C. ___ (May 12, 2020).

III.   Penalty

That leaves only the Commissioner's determination that a penalty under section 6662 was applicable to Oakbrook. This penalty is applicable when a partnership takes a return position that might create a substantial understatement of tax due at the partner level, sec. 6662(b)(2), or that is negligent or shows disregard of the rules and regulations, sec. 6662(b)(1). The Code tells us that

---

[11] Despite the Commissioner's suggestion to the contrary, no court has directly addressed whether section 1.170A-14(g)(6)(ii), Income Tax Regs., is invalid. In PBBM-Rose Hill the Fifth Circuit refused to address the issue because the taxpayer had not first raised it in this Court. See PBBM-Rose Hill, 900 F.3d at 209 n.8.

**[*42]** negligence is the "failure to make a reasonable attempt to comply with the [Code]" and that disregard includes "careless, reckless, or intentional disregard." Sec. 6662(c). And the Code also tells us that an understatement is substantial if it exceeds the greater of $5,000 or "10 percent of the tax required to be shown on the return." Sec. 6662(a), (b)(2), (d)(1)(A). (The determination of an underpayment cannot be made at the partnership level because partnerships don't pay taxes, partners do. We can still, however, determine the *applicability* of the understatement (or negligence, or intentional-disregard) penalty at the partnership level. See VisionMonitor Software, LLC v. Commissioner, T.C. Memo. 2014-82, 108 T.C.M. (CCH) 256, 260 (2014).)

These penalties don't apply to a taxpayer who had reasonable cause for an underpayment and acted in good faith. Sec. 6664(c)(1); sec. 1.6664-4(a), Income Tax Regs. The determination of whether a taxpayer acted with reasonable cause and in good faith is one we make on a case-by-case basis. Sec. 1.6664-4(b)(1), Income Tax Regs. One circumstance that indicates reasonable cause and good faith is an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances. Id. Reliance on certain facts can constitute good faith if, "under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith." Id.

**[\*43]** Here, we deny any deduction for Oakbrook's donation of the conservation easement because the provisions in the Deed violated the extinguishment-proceeds clause in the regulation. But we think Oakbrook's position was reasonable: There is the PLR that the IRS itself issued that suggested a clause like the one in the deed would work. Section 1.6662-3(b)(3), Income Tax Regs., tells us that a return position generally satisfies the reasonable-basis standard if it is based on, among other types of authorities, private letter rulings. See secs. 1.6662-3(b)(3), 1.6662-4(d)(3)(iii), Income Tax Regs.; see also Bunney v. Commissioner, 114 T.C. 259, 267 n.10 (2000) (PLRs may be authorities showing reasonableness of return position). There is disagreement among us on whether the contested regulation is valid, and that might also be some indication of the objective reasonableness of Oakbrook's position. Trial proved that Horton knew he was unfamiliar with the mechanics of setting up a conservation easement and relied on what he saw as the safety of form language that echoed the PLR. We find this was reasonable under these circumstances, and based on the credibility of his trial testimony, taken entirely in good faith. Oakbrook's error--if it turns out to be an error--was reasonable.

**[\*44]** We therefore also conclude that the penalty that the Commissioner determined was applicable cannot be sustained.

<u>An appropriate decision will be entered</u>.